OPINION OF THE COURT
WlLMER J. PATLOW, J.
This is a medical malpractice action wherein the gravamen of the complaint is failure to aggressively treat malignant melanoma which first surfaced as a lesion on the right thigh of plaintiff’s deceased in May of 1976.
Defendants Genesee Valley Group Health Association-Joseph C. Wilson Health Center and James S. Williams, M. D., move to dismiss the action on Statute of Limitations grounds (CPLR 214-a; EPTL 5-4.1).
Additionally, the attorney for these defendants seeks summary judgment dismissing the complaint apparently on the grounds that neither the Genesee Valley Group Health Association (hereinafter referred to as GVGHA) nor the Wilson Health Center is a proper party defendant, and upon the grounds that Dr. Williams’ treatment of the decedent in 1976 was too remote in time to have been related to the death in 1981.
Defendants Drs. M. D. Buck and Paul Hudson also move to dismiss on Statute of Limitations grounds.
Plaintiff cross-moves for the following relief: (1) summary judgment dismissing all affirmative defenses of Statute of Limitations, (2) deposition dates for Drs. Buck and Hudson and administrative officers of the Wilson Health Center and GVGHA, (3) an order requiring the Wilson Health Center to answer the complaint, and (4) permission to issue a supplemental summons and amended complaint adding “Medical Group of the GVGHA” as a party defendant.
The lesion on decedent’s right thigh was removed at the Wilson Health Center on June 24, 1976 by Dr. Williams. The excised tissue was analyzed and reported to be malignant.
There exists a sharp question of fact as to whether the decedent was told of the cancer. Plaintiff asserts that the *718 patient was not told, or “meaningfully” told, of his condition until December of 1979 when he returned for examination of a bleeding mole on his back. According to plaintiff, she and decedent had in fact discovered the mole in the summer of 1979 but, unaware of its significance, did not contact the defendant facility until they noticed the bleeding in December.
In contrast, Dr. Williams testified at an examination before trial that he discussed the condition with decedent in July of 1976 and referred the case to Dr. Buck for followup treatment.
The medical records indicate that plaintiff’s decedent was seen by Dr. Buck later in 1976 for a rash in the groin.
On August 4, 1977, the patient was seen by Dr. Hudson for papules on his genitalia, for which he was referred to a dermatologist, Dr. Pelton.
An entry on decedent’s chart dated August 11, 1977 indicates he is to come in the following week for a follow-up of melanoma.
On August 23, 1977 the patient was examined by Dr. Buck who later reduced his observations to a written note. The note mentions a suspicious cutaneous lesion on the right upper arm which the doctor planned to discuss with Dr. Pelton. Apparently Dr. Buck also directed an X ray and certain laboratory tests. The note concludes with the statement that “Patient will return to me for any further problems”.
The patient’s chart indicates that the next visit to the Wilson Health Center was not until December 5, 1979 for surgical removal of the mole on his back. He was thereafter regularly seen at the center until his death in February, 1981. However, the physicians who treated him then were different individuals from those involved in this lawsuit.
Thus, Dr. Buck’s last contact with plaintiff’s decedent was on August 23, 1977, Dr. Hudson last saw him on August 4, 1977 and Dr. Williams’ last treatment was on July 1,1976 although he also states he may have seen the patient once more after December 5, 1979 when covering hospital rounds for the then treating physician.
*719 The parties agree that the applicable Statute of Limitations is CPLR 214-a which provides that: “An action for medical malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure * * * For the purpose of this section the term ‘continuous treatment’ shall not include examinations undertaken at the request of the patient for the sole purpose of ascertaining the state of the patient’s condition.”
Furthermore, the Statute of Limitations for wrongful death actions (EPTL 5-4.1) is two years from the date of death, provided, however, that on that date decedent in fact had a viable and timely claim against the wrongdoer.
Inasmuch as this action was commenced in March, 1982, well within the two-year limitation of EPTL 5-4.1, the only question is whether the two and one-half year medical malpractice Statute of Limitations (CPLR 214-a) had run as of the date of death (Feb. 18, 1981).
More particularly, the question presented is whether there was “continuous treatment” of decedent within the meaning of CPLR 214-a so as to toll the running of the two and one-half year period.
A leading case on what constitutes continuous treatment is McDermott v Torres (56 NY2d 399, 405), in which the New York Court of Appeals explained: “[T]he time in which to bring a malpractice action is stayed ‘when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint’ [citation omitted]. The concern, of course, is whether there has been continuous treatment, and not merely a continuing relation between physician and patient.”
The Court of Appeals continued (p 405): “As a starting point, continuous treatment does not contemplate circumstances where a patient initiates return visits merely to have his or her condition checked [citation omitted]. The Statute of Limitations may begin to run ‘once a hospital or *720 physician considers the patient’s treatment to be completed and does not request the patient to return for further examination’ [citations omitted]”.
The same court expressed the underlying rationale for the continuous treatment rule as follows: “The policy underlying the continuous treatment doctrine seeks to maintain the physician-patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure [citation omitted]. Implicit in the policy is the recognition that the doctor not only is in a position to identify and correct his or her malpractice, but is best placed to do so.” (McDermott v Torres, 56 NY2d, at p 408.)
It has been held that “treatment is not ‘continuous’ when the interval between treatments exceeds the limitations period [citations omitted]” (Barrella v Richmond Mem. Hosp., 88 AD2d 379, 384), but “no existing rule defines with any precision what amount of time shorter than the period of limitations may intervene without a break in continuity” {supra).
It is apparent that in order to apply the continuous treatment doctrine to the case at bar, plaintiff must show some basis for imputing the subsequent cancer treatments received by decedent at the Wilson Health Center to each of the individual defendant doctors.
In McDermott (56 NY2d 399, 407-408, supra), the Court of Appeals declined to impute the treatment of the defendant doctor to the defendant laboratory, stating that on the facts presented no continuing relations between the lab and the patient or his doctor had been shown. In certain subsequent cases the courts have likewise failed to find a sufficient factual relationship for imputing continuing treatment (see, e.g., Florio v Cook, 65 AD2d 548, affd 48 NY2d 792; Coyne v Bersani, 94 AD2d 961; and Ruane v Niagara Falls Mem. Med. Center, 91 AD2d 1176).
The facts of this case are strikingly different, however.
The “Member Handbook” of the Wilson Health Center, which displays “Genesee Valley Group Health Association” on its cover, states on page 3 that: “Group Health is a prepaid medical group practice providing you and your *721 family comprehensive medical care twenty-four hours a day, seven days a week, when necessary. It is a health plan specifically designed to meet your needs through the Joseph C. Wilson Health Center.”
The handbook continues at page 6 under “Your Health Care Providers” to state: “When you call the Wilson Health Center for your first appointment, a Health Center registrar will assist you in selecting your physician * * * In addition, most of the physicians work with a nurse clinician or physician’s assistant. These providers will become your health care team.”
In a pamphlet entitled “Group Health ... A Health Plan for the 80’s” it is said: “Members of the Medical Group staff work as a team to look after your total health care needs. Each physician has access to your medical record, maintained at the Health Center, so you are assured continuity of care.”
In a “Questions and Answers” brochure supplied by GVGHA it is stated: “If you come for an urgent problem and your physician is not available, another provider who has access to your medical record will see you.”
Finally, the “Member Handbook” provides at page 12 under “Your Obligation as a Group Health Member”: “Group Health is a comprehensive health insurance plan, which means that virtually all health care services are covered, usually in full. Group Health has arranged for all necessary health care services to be provided by the Medical Group, in most cases, at the Wilson Health Center. As a member of Group Health, you are obligated to use the Medical Group in order for health care services to be covered. Except in a life threatening situation, all health care services must be provided by or arranged by a Group Health physician”.
Thus, defendants’ own literature demonstrates that the Wilson Health Center is a comprehensive medical clinic whose physicians and other medical personnel work together as a team. Members such as plaintiff and her deceased husband must utilize the services of one or more of the physicians provided by the clinic. The representation *722 is clear that those who join the Wilson Health Center in fact join the clinic, rather than engage the services of any one particular physician.
Therefore, this court finds under the circumstances of this case that subsequent visits by the decedent to the Wilson Health Center for the care and treatment of his cancerous condition will be imputed to the individual physicians who earlier treated decedent at the same clinic.
This finding is consistent with Marabello v City of New York (99 AD2d 133,139-140) wherein the court ruled that, if warranted on the facts, the continuous treatment exception may be applied to the 90-day notice of claim period for a patient who is successively treated for the same or related illnesses or injuries by different municipal medical facilities under the aegis of the New York City Health and Hospitals Corporation. In support of its ruling, the court found implicit in the corporation’s statement of purposes an “intent to create an umbrella health and hospitals corporation to facilitate the development of optimum efficiency and holistic health care” {supra, p 140).
The conclusion reached by the court in the case at bar has the following consequences for the defendants herein.
First, the treatment which commenced December 5, 1979 at the Wilson Health Center will be imputed to Drs. Williams, Hudson and Buck notwithstanding the fact that it was rendered by other physicians associated with the clinic. This means that defendants’ treatment will be deemed to have continued throughout the period from December 5, 1979 to the patient’s death on February 18, 1981.
Second, and with significance only for Dr. Williams, the treatment rendered by Drs. Hudson and Buck in 1977 may be imputed to him. Dr. Buck’s examination on August 23, 1977 was clearly in connection with the melanoma, and a jury could find that either doctor had a continuing duty to disclose the clinic’s diagnosis at the time of the office visits.
With respect to Dr. Williams, the court also notes that at all times in question he held the position of Chief of the Department of Surgery and thus possessed whatever continuing authority and responsibility for review of patient care that position entailed.
*723 Thus the court concludes that the question of whether or not there existed a continuous course of treatment from June of 1976 when the melanoma was diagnosed through February of 1981 when the patient died of the disease is a question of fact which must be determined at trial.
It is to be noted that none of the gaps in treatment are in themselves longer than the medical malpractice Statute of Limitations. Consequently there is no requirement of outright dismissal (see Barrella v Richmond Mem. Hosp., 88 AD2d 379, supra; Lomber v Farrow, 91 AD2d 725).
The trier of fact must look to a number of factors which other courts have considered and which may be relevant here. These factors include whether or not the hospital or physician himself considers the treatment ended and does not request a return visit (Gudmundson v Axelrod, 57 NY2d 930; McDermott v Torre, 56 NY2d 399, 405, supra), whether or not the patient disregards the doctor’s advice to return (Barrella v Richmond Mem. Hosp., 88 AD2d 379, 384, supra) and the latency of the symptoms (supra).
The court wishes to distinguish in particular Davis v City of New York (38 NY2d 257), cited by defendants, from the case at bar. In Davis, the Court of Appeals dismissed on Statute of Limitations grounds a complaint against a cancer detection center for an alleged failure to diagnose a carcinoma. However, in that case, the defendant clinic offered diagnostic services only which were by their nature “discrete and complete” (see Barrella v Richmond Mem. Hosp., 88 AD2d 379, 384, supra, for this characterization). Unlike the case at bar, there was no suggestion in Davis that the defendant promised to render comprehensive medical care.
Furthermore, Davis (supra) is distinguishable in that there the alleged misfeasance consisted of a failure to diagnose. Here, however, the defendants allegedly neglected to communicate the severity of that diagnosis, and thereafter allegedly failed to aggressively or persistently treat the life-threatening condition.
Thus, plaintiffs have alleged continuing omissions based upon a continuing duty, such allegations being well recognized as forming the basis for a medical malpractice action (see, e.g., Fonda v Paulsen, 46 AD2d 540, 543).
*724 If plaintiff can prove those allegations, then the Statute of Limitations cannot be said to be running at the same time the cause of action is accruing, for such would run counter to the stated purpose of the continuous treatment doctrine to permit the physician to “identify and correct his or her malpractice” (McDermott v Torre, 56 NY2d 399, 408, supra).
In accordance with the above, each of the motions to dismiss the complaint on Statute of Limitations grounds is hereby denied and the cross motion to dismiss the affirmative defenses of Statute of Limitations is likewise denied. However, the court grants the alternative relief requested by defendants GVGHA-Wilson Health Center and Dr. Williams, to wit, permission to amend their answers to assert and thereby preserve their Statute of Limitations defense.
The court also hereby grants that portion of plaintiff’s cross motion which seeks an order requiring the depositions of Drs. Hudson and Buck.
Additionally, Dr. Williams’ motion for summary judgment is denied inasmuch as there is at least one triable issue of fact: whether or not this doctor meaningfully communicated the nature and severity of the disease to decedent.
The summary judgment motion of GVGHA-Wilson Health Center will now be considered.
The Executive Administrator of GVGHA has submitted affidavits stating in sum and substance that GVGHA is merely an insurance company authorized by the New York State Superintendent of Insurance to write health insurance policies on a prepaid basis. According to the affidavits, GVGHA is an affiliate or subsidiary of Blue Cross and its offices are located in the same building as Blue Cross/ Blue Shield. It is stated that GVGHA does not provide medical services and has no connection whatsoever with Drs. Williams, Hudson or Buck.
However, this administrator explains, GVGHA does have a contract with the so-called Medical Group of the GVGHA to staff the facilities known as the Wilson Health Center. The Medical Group was formed as a partnership in 1975 and became a professional corporation in 1981. Dr. Williams was a partner of the Medical Group and later a *725 shareholder of the corporation. Drs. Buck and Hudson never belonged to the Medical Group as partners or shareholders, but practiced at the Wilson Health Center under the auspices of a residency program at the University of Rochester. The university paid their salaries, although the Medical Group contributed partial reimbursement through the associated hospitals program.
According to GVGHA’s executive administrator, the Wilson Health Center is not a corporate entity or partnership of any kind, but merely the name of a building in which medical offices and facilities are located.
In opposition, counsel for plaintiff has supplied the court with the GVGHA insurance contract, portions of which tend to show GVGHA’s control over the medical services provided.
The contract provides under article VII thereof that, except for emergencies: “1. To obtain the benefits of this contract, the member is subject to all the rules and regulations of the Health Center and must receive care at the GVGHA Health Center or be referred by or approved for the care by a member of the GVGHA Medical Group”.
The term “GVGHA Health Center” is defined under article I of the contract as follows: “II. ‘GVGHA Health Center’-the Joseph C. Wilson Center, 800 Carter Street, Rochester, New York, and any such other facilities as may be designated from time to time by GVGHA.”
Finally, the contract provides, under article II and IV, that, except for emergencies, hospital service and professional care shall be available “only when provided, arranged or approved by the GVGHA Medical Group.”
Counsel for plaintiff has also quoted the certificate of incorporation of GVGHA which lists as one of its purposes: “to enter into contracts, including contracts for the leasing of hospital facilities, with individuals, partnerships, associations and corporations — including hospital, hospital service, non-profit medical, and professional service corporations — both public and private for the purpose of providing medical service and hospital service as may be necessary to effectuate the foregoing services” (emphasis supplied).
*726 Despite the fact that neither GVGHA nor the Wilson Health Center is a hospital per se, the court finds the following authorities to be applicable here.
The general rule for attributing liability to hospitals for the negligent acts of physicians practicing within is as follows: “It is true that ordinarily a hospital is answerable only for the acts of its employees and not for those of private attending physicians or surgeons. However, there may be circumstances under which liability may be imposed for independent contractors [citations omitted]. The answer lies in the degree of control exercised by the hospital.” (Rivera v Bronx-Lebanon Hosp. Center, 70 AD2d 794, 796.)
In applying this rule, one court concluded that: “the defendant hospital, having held itself out to the public as an institution furnishing doctors, staff and facilities for emergency treatment, was under a duty to perform those services and is liable for the negligent performance of those services by the doctors and staff it hired and furnished to decedent. Certainly, the person who avails himself of hospital facilities has a right to expect satisfactory treatment from any personnel who are furnished by the hospital” (Mduba v Benedictine Hosp., 52 AD2d 450, 454).
In accordance with the foregoing, the liability of GVGHA and the Wilson Health Center under the theory of respondeat superior cannot be determined solely from the nature of the legal relations between the parties, but, rather, must include consideration of the degree of control each in fact exercised. Such is a question of fact which must be determined at trial.
Significantly, plaintiff has not yet had the opportunity to depose administrators of either of these defendants. Thus, it appears that discovery on the respondeat superior issue is incomplete and the motion for summary judgment premature.
The court is particularly concerned that further discovery be undertaken with respect to the legal status of the Wilson Health Center, which presents itself as an established medical facility, presumably licensed by the State of New York.
*727 Therefore, the motion for summary judgment by GVGHAWilson Health Center is denied at this time.
The plaintiff’s cross motion is hereby granted to the extent that it seeks depositions of the administrative officers of GVGHA and the Wilson Health Center.
Plaintiff also cross-moves to compel the Wilson Health Center to answer the complaint. This portion of the cross motion is hereby denied without prejudice.
Finally, plaintiff seeks permission to issue a supplemental summons and amended complaint adding the “Medical Group of the GVGHA” as a party defendant.
It is provided in CPLR 3025 (subd [b]) that a party may amend his pleading at any time by leave of court, the leave to be freely granted upon such terms as may be just.
The affidavits and documents submitted on this motion show that the Medical Group of the GVGHA is only one of the technically distinct entities which together provide the total health care package subscribed to by plaintiff’s decedent.
In fact, plaintiff did name and identify the most visible components of the health care plan: GVGHA itself, the Wilson Health Center, and the treating physicians, each of whom, it turns out, either belong to or worked under the authority of the Medical Group of the GVGHA.
The court finds that the relationship between the proposed defendant and the named defendants was sufficiently close so as to fairly apprise the Medical Group of the GVGHA of the instant proceedings (see Richardson v Millard, 58 Misc 2d 502, 503, app dsmd 33 AD2d 820).
Although the court will allow the amendment, it also rules that for Statute of Limitations purposes the Medical Group is united in interest with Drs. Williams, Hudson and Buck within the meaning of CPLR 203 (subd [b]) because the liability to which the Medical Group is exposed is vicarious in nature (see Connell v Hayden, 83 AD2d 30, 46-49; La Bay v White Plains Hosp., 97 AD2d 432, 433).
The plaintiff’s motion for permission to add the Medical Group of the GVGHA as a party defendant is granted with *728 the proviso that such party is united in interest with the defendant physicians for purposes of the Statute of Limitations.